1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA  - WESTERN DIVISION

10

11    CHEEDAD ADHESIVE TRADE          )    Case No: CV 08-4035 DSF (JTLx)
12    MARKS PRINTING CO. LTD.,        )
                                      )
13                Plaintiff,          )
                                      )    FINDINGS OF FACT AND
14         vs.                        )    CONCLUSIONS OF LAW AFTER
                                      )    COURT TRIAL
15    GEORGINA 712, INC., et al.,     )
                                      )
16                Defendants.         )
      _____)

17

18         This matter was tried by the Court, sitting without a jury, on July 28 and 29,

19    2009.  Having heard the admissible evidence presented by the parties, and having

20    considered the exhibits, the proposed findings of fact and conclusions of law,

21    including admissions in the responses to the proposed findings of fact and

22    conclusions of law and the Pretrial Order, the Court issues the following findings

23    of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil

24    Procedure.

25                                    FINDINGS OF FACT

26         1.  Plaintiff and Counter-Defendant Cheedad Adhesive Trade Marks

27    Printing Co. Ltd. ("Cheedad") is a corporation organized under the laws of Hong

28    Kong, the People's Republic of China, which does not maintain an office or

                                           1

1    business in the State of California.

2         2.  Defendant and Counterclaimant Georgina 712, Inc. is a corporation

3    organized and existing under the laws of the State of Delaware which was known

4    as Intervisual Communications, Inc. at the time of acts at issue in this litigation.

5    The company is referred to as "Intervisual" in these Findings of Fact and

6    Conclusions of Law.

7         3.  Defendant James D. Richwine ("Richwine") is an individual residing in

8    Santa Monica, California.

9         4.  Intervisual was engaged in the business of marketing and promotion.

10        5.  Cheedad is a commercial printer.

11        6.  Bimbo ("Bimbo"), a worldwide baking conglomerate, was one of

12   Intervisual's largest customers.

13        7.  In 2004 Bimbo asked Intervisual to bid on a project requiring that

14   scratch 'n' sniff stickers be placed in cookie boxes used in a promotion for the

15   movie Shrek 2 ("the Shrek project").  The promotion was to be carefully

16   orchestrated with an advertising campaign associated with the release of Shrek 2 in

17   June of 2004.  The promotion required that the scratch 'n' sniff stickers ultimately

18   arrive at the plant of Bimbo's subsidiary, Marinela, in Mexico sufficiently in

19   advance of the movie's release date so the stickers could then be placed in the

20   cookie boxes and brought to the market while the television advertising campaign

21   was on the air in Mexico.

22        8.  Intervisual had hired Cheedad previously.  On each of these prior

23   occasions, Cheedad had prepared samples that it sent to Intervisual for the purpose

24   of having Intervisual sell the job to its customer.  Intervisual then presented the

25   samples to its customer, obtained the customer's approval, and placed an order

26   with Cheedad.  In these instances Cheedad was able to produce a final product that

27   was of the same quality as the samples.

28        9.  Cheedad, through its representative, Grace Cheng ("Cheng"), advised

2

1   Intervisual that Cheedad had the experience and expertise to produce scratch 'n'

2   sniff stickers and agreed to prepare production samples for review by Intervisual

3   and Bimbo.  Cheedad knew that Intervisual was going to submit samples to Bimbo

4   as a representation of the quality of the ultimate scratch 'n' sniff stickers Cheedad

5   could produce in production.

6         10.  On or about February 17, 2004, Intervisual received samples from

7   Cheedad.

8         11.  The samples that Cheedad initially sent to Intervisual were stock

9   samples, as opposed to production samples.

10        12.  When it submitted the samples to Intervisual, Cheedad did not tell

11   Intervisual (a) that the samples were handmade and were not production samples;

12   (b) that Cheedad did not have substantial experience in producing scratch 'n' sniff

13   stickers; (c) that Cheedad had only performed one prior job involving scratch 'n'

14   sniff stickers; (d) that Cheedad did not have experience producing other products

15   with scents; (e) that Cheedad did not have a sufficient supply of scents available

16   for the needs of the job; and (f) that the available scents were not of sufficient

17   strength for the job.

18        13.  Intervisual submitted Cheedad's samples to Bimbo, selected Cheedad

19   for the job, devoted time, energy, and resources to the Shrek project, and made

20   financial arrangements with Bimbo for the Shrek project that were premised on a

21   budget that assumed that Cheedad had the experience and expertise to timely

22   produce the stickers in a manner acceptable to Bimbo.

23        14.  The initial wrappings ordered by Intervisual were not odor resistant,

24   and therefore were not suitable for placing in packages of cookies.  In addition,

25   Cheedad did not initially procure scents that were sufficiently strong to be utilized

26   in the Shrek project.

27        15.  Intervisual decided to find on its own satisfactory scents that could be

28   utilized to satisfy Bimbo's requirements for the Shrek project.  Intervisual air

shipped the scents to Cheedad.  Because these substitute scents had to be purchased, shipped, tested in production and approved by Bimbo, the problems in selecting the scents caused substantial delays in the project.

16.  These delays were not the fault of Cheedad.

17.  The ultimate production samples were not approved until May 2004. The defense makes much of the alleged conduct or omissions, and alleged representations, of Cheedad before May 12.  The Court, however, finds the essential (and undisputed) fact to be that a pro forma invoice was signed by both parties on May 12 specifying that Cheedad would deliver approximately 62 million Shrek scratch 'n' sniff prizes in twenty different versions in partial shipments until June 10, 2004 for $522,564.00.  Intervisual's implication that it signed the invoice "under duress" has no support in fact or law.

18.  Cheedad produced and delivered in Hong Kong (pursuant to the invoice) approximately 62 million prizes in twenty different versions by June 10, 2004.

19.  Cheedad billed Intervisual $522,554.00 for the Shrek project.  In addition, Intervisual owed a balance of $28,297.45 for the previous Blaster project, for a total of $550,851.45.  Intervisual paid Cheedad $258,297.47.  The balance owed by Intervisual to Cheedad was $292,553.98.

20.  From the late summer of 2004 through March of 2005, Intervisual and Cheedad were involved in a dispute in which (a) Cheedad claimed it was owed money in connection with the account that is placed at issue in the statement attached as Exhibit B to its Complaint; and (b) Intervisual claimed that it had suffered damages as a result of Cheedad's inability to produce scented stickers as represented.  Trial Exhibits 8, 10, 11, 12, 13, 14, 15, 16 and 17 are true and correct copies of some of the correspondence between the parties which framed this dispute.

21.  From the late summer of 2004, Intervisual and Cheedad were involved

in efforts to settle their dispute. These efforts involved telephone calls, e-mails, and one in-person meeting.

22.  Trial Exhibit 18 is a true and correct copy of a chain of e-mails between Alvaro Lopez ("Lopez") at Intervisual and Cheng that began on March 1, 2005 and continued to March 15, 2005.  On March 1, 2005, Lopez advised Cheng that "[o]ur customers may have projects the second half of 2005 and we are currently making presentations to them.  We have not had additional programs in 2005 after Shrek."

23.  On March 12, 2005, Lopez sent Cheng an e-mail message containing the following text:

> I am glad that we are very close to a final agreement although still we have a difference that we are willing to share. Considering my additional discussion with Jim based on your below e-mail, we agree to the below settlement for a total of $200,851.45:
>
> 1.  $28,297.45 due from Blaster project to be paid at 3/15/05.
>
> 2.  $50,000 to be paid if and when and at the time the next PO is issued from Intervisual to Cheedad. These monies to be paid in recognition of the Shrek settlement.  The new project would be under a letter of credit.
>
> 3.  $50,000 to be paid if and when and at the time a second PO is issued from Intervisual to Cheedad. These monies to be paid in recognition of the Shrek settlement.  The second project would be under a letter of credit.
>
> 4.  $50,000 to be paid if and when and at the time a third PO is issued from Intervisual to Cheedad.

5

1           These monies to be paid in recognition of the

2           Shrek settlement. This third project would be

3           under a letter of credit.

4       5.       $22,554 to be paid if and when and at the time a

5           fourth PO is issued from Intervisual to Cheedad.

6           These monies to be paid in recognition of the

7           Shrek settlement.  This fourth project would be

8           under a letter of credit.

9      I wait for your final acceptance of the above to proceed

10      with it.

11     24.  On March 15, 2005, in response to Lopez' March 12, 2005 e-mail,

12 Cheng sent Lopez an e-mail message containing the following text:

13      Dear Alvaro:

14      Thanks for your mail That is find and we confirm and

15      accept your settlement propose. Many thanks. And we

16      looking for your new project.

17      Best regards

18      Grace

19     25.  The agreement reflected by the March 12 and March 15 e-mails

20 ("March 15 Agreement") presented a logical and reasonable business solution that

21 was preferable to protracted and expensive litigation.  Cheedad had employed

22 lawyers to send letters, and had sent an e-mail expressing a preference for a

23 settlement "instead of the lawyer fee."  The parties were faced with two options:

24 (1) a court battle over their relative responsibilities for a failed transaction; or (2)

25 pre-litigation settlement of the dispute that eliminated legal expense, required an

26 immediate cash payment to Cheedad, with a reduced total payment, and raised the

27 prospect that potential new business might materialize and permit the parties to

28 repair their business relationship while jointly earning profits.  The parties chose

6

1    the second option.

2         26.  After March 15, 2005, Cheedad accepted a (late) payment of

3    $28,297.45 as part of the Settlement Agreement.

4         27.  After March 15, 2005, Intervisual requested that Cheedad provide

5    quotes on the following:  (1) 05-078 Eyeballs; (2) 05-144 Round Styrene Clip; (3)

6    05-145 Snap n' Fun on Styrene; (4) 05-190 Olocoons Promotion; (5) 05-284

7    Buildable Paper Spinners; and (6) 05-295 Surfboard with Dimple.  Trial Exhibits

8    19, 20, 21, 22, 23 and 24 are true and correct copies of correspondence between the

9    parties relating to these requests.  Intervisual also asked Cheedad to bid on other

10   projects, including project no. 05-234 referred to in Trial Exhibit 143.

11        28.  Intervisual asked Cheedad to bid on each and every job for which

12   Cheedad was qualified to produce products to be utilized in Intervisual's

13   promotions.  Intervisual diligently pursued each of these projects, devoting

14   substantial time, energy and resources to each of them.  Notwithstanding

15   Intervisual's pursuit of these projects, Intervisual's customers did not pursue any of

16   these projects.  Bimbo never placed any other orders with Intervisual.

17        29.  The parties dispute the legal nature of the March 15 Agreement.

18   Cheedad contends it was an accord that was not satisfied, and therefore did not

19   extinguish the original debt until paid in full.  Intervisual contends it was a

20   novation (or a substituted contract) that extinguished the original $292,553.98

21   claimed by Cheedad based on the late payment of only $28,297.45, because

22   Intervisual was never able to obtain further business from Bimbo.

23        30.  The March 15 Agreement (which was drafted by Intervisual) is

24   ambiguous in that it states both that the total settlement amount is $200,851.45, and

25   that $172,554 in payments is conditioned on further business from Bimbo.

26   Although the writing contains the terms "final agreement" and "settlement," it does

27   not clearly indicate that it was meant to completely extinguish the old debt.

28        31.  Considering the testimony and all the evidence presented, the Court

7

1   concludes that the March 15 Agreement was an accord by which Cheedad agreed

2   to accept payment of $200,851.45 instead of the $292,553.98 it was owed.

3       32.  The Court further finds: (a) Cheedad did not intend to waive any rights

4   to payment of $292,553.98 if Intervisual never gave Cheedad any further orders;

5   (b) Cheedad did not intend that it would receive total payment of less than

6   $200,851.45; (c) Cheedad did not intend that receipt by Cheedad of $200,851.45

7   was subject to any precondition; and (d) Cheedad did not intend the "if and when"

8   language of the March 15 Agreement to constitute a waiver on the part of Cheedad

9   of any rights to receive less than $200,851.45.

10      33.  From Cheedad's perspective, the "if and when and at the time that"

11  provision of the March 15 Agreement were an accommodation by Cheedad in

12  favor of Intervisual to accept deferred payment, and were based on the assumption

13  that there would be future orders.

14      34.  Intervisual's obligation to pay the $292,553.98 remained in force in

15  light of Intervisual's failure to perform under the March 15 Agreement.

16      35.  In March of 2006, Intervisual sold its assets to Structural Graphics

17  ("Structural").  When Structural bought Intervisual's assets, it employed Richwine

18  to pursue international business.  Richwine continued to pursue projects with

19  Bimbo when he became employed by Structural.  Bimbo never placed any orders

20  with Structural.

21      36.  Richwine was the 100% shareholder of Intervisual at the time of the

22  asset sale.

23      37.  Cheedad did not present any evidence of commingling of funds and

24  other assets, a failure to segregate funds, or the unauthorized diversion of corporate

25  funds or assets to other than corporate uses.

26      38.  Cheedad did not present any evidence of a failure to obtain authority to

27  issue stock or to subscribe to or issue stock.

28      39.  Cheedad did not present any evidence that Richwine held himself out as

8

1   being primarily liable for the debts of Intervisual.

2       40.  Cheedad did not present any evidence as to the conduct of the

3   corporation.

4       41.  Cheedad did not present any evidence of the absence of minutes or

5   other corporate records.

6       42.  Cheedad did not present any evidence that Richwine dominated or

7   controlled the affairs of the corporation.  To the contrary, Richwine testified that

8   the corporation acted subject to the supervision of a board of directors.

9       43.  Cheedad did not present any evidence of a failure to adequately

10  capitalize the corporation.

11      44.  Cheedad did not present any evidence about the concealment and

12  misrepresentation of the identity of the responsible ownership of the corporation.

13      45.  Cheedad did not present any evidence of a disregard of legal

14  formalities.

15      46.  Intervisual did not present sufficient evidence to meet its burden of

16  proving fraudulent misrepresentation, negligent misrepresentation, or fraudulent

17  concealment.

18                              CONCLUSIONS OF LAW

19      1.  This court has jurisdiction over this action under 28 U.S.C. §§ 1332 and

20  1338 because it presents a controversy between citizens of different states and the

21  matter in controversy exceeds the sum of $75,000.

22      2.  Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391

23  because a substantial amount of the events or occurrences took place in the Central

24  District of California.

25      3.  The operative contract between Cheedad and Intervisual was the May 12,

26  2004 pro forma invoice.  Cheedad performed pursuant to the invoice.

27      4.  Cheedad made no false or otherwise actionable representations

28  concerning the Shrek project to Intervisual.

5.  Cheedad never held a duty concerning Intervisual and the Shrek project to disclose any facts to Intervisual.

6.  The balance due from Intervisual to Cheedad on the Blaster and Shrek projects is $292.553.98.

7.  The March 15 Agreement constituted an accord, and was conditioned on full payment being made by Intervisual in the amount of $200,851.45.  See Cal. Civ. C. § 1521.  Because the March 15 Agreement does not expressly state that it is intended to extinguish the original debt, and that certainly was not Cheedad's intent, it was not a novation.  See Cahn v. California Wrecking Co., 9 Cal. 2d 617, 619 (1937); Hunt v. Smyth, 25 Cal. App. 3d 807, 818 (1972).  In the absence of payments totaling that amount, there was no satisfaction and the accord therefore did not replace the original debt of $292.553.98.  See Cal. Civ. C. § 1522.

8.  Cheedad is entitled to judgment in its favor in the amount of $292.553.98.

9.  Cheedad failed to satisfy its burden of proving the elements of alter ego: (a) that there was a unity of interest in ownership between Intervisual and Richwine so that the separate corporate personality of Intervisual no longer existed; and (b) that, if the acts placed at issue in the litigation were treated as Intervisual's alone, an inequitable result would follow.  See Associated Vendors, Inc. v. Oakland Meat Co., Inc., 210 Cal. App. 2d 825 (1962).

10.  Richwine is entitled to have judgment entered in his favor on Cheedad's complaint.

8/13/09

Dated: _____

_____
UNITED STATES DISTRICT JUDGE

10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28